Thank you, Your Honor. May it please the Court. My name is Charles Hinkle, and I represent Epstein, Lowe, and James. Heather Van Meter, seated at counsel's table, represents Sir Robert MacDonnell. There are two separate appeals here. Yesterday, I received from Ms. Van Meter an order from this Court that had not been sent to me and that was not issued in the Epstein case. It was only issued in the MacDonnell case, so I didn't see it until yesterday. And it had to do with whether or not Botzel has been undermined or overruled by Will v. Halleck. So I spent the day yesterday looking at that question and submitted a memo to you on that this morning. I apologize for the oversight, counsel. That was undoubtedly our fault. It really was just to give you all a heads-up so that if we asked a question about the Will case, counsel wouldn't be caught flat-footed. Well, obviously, the first question before any court is one of jurisdiction. And I realize it's rather unorthodox to submit a memo at this late date. But I guess what I would say about that is that Will v. Halleck did not state any new law. And I think the best evidence of that is that the Ninth Circuit has decided several cases involving interlocutory appeals since Will v. Halleck was decided. And I'm just guessing off the top of my head, as I took a quick look yesterday, in at least half of those cases, the Ninth Circuit doesn't even mention Will v. Halleck. So it doesn't consider it to have stated any new law. And I don't think that's true. Well, we haven't noticed. Exactly. But I think really what the Supreme Court in Will said was we've said it before and we mean it. You know, it wasn't enunciating any new policy. It was just saying, you know, we've said these things before and we mean it. Well, could I ask you, why isn't this case distinguishable from our earlier decision in Batsell? And Batsell involved a California statute, which actually provided for a right to an appeal. Now, I'm not suggesting that state law automatically applies. But doesn't the failure of Argonne to provide for an appellate process cause us to examine the question of whether this really was intended by the Argonne legislature to be what was called an immunity-conferring right? Well, several responses to that, Your Honor, all of which are addressed in the memo here today. First, as you say, the question of federal appellate jurisdiction is a question of federal law, not state law. No, but we have to look. This is sort of a curious hybrid. There would be no federal basis for the exercise of appellate jurisdiction here. We wouldn't do it in an ordinary federal case. And so we're looking to state law both for the substantive right, but also the procedure that the state provides sheds light on what it regarded as the substantive right that it was conferring. Yes, Your Honor. And the, excuse me, I just ran back to my office to get my glasses. I'm sorry. Do you need some water? No. They were in the X-ray machine downstairs when I got back. But I didn't know that until I made my 100-yard sprint. The Oregon Supreme Court does allow interlocutory review of decisions like this, Your Honor. And I cite the cases in there involving long-arm jurisdiction, which demonstrates that, in fact, the Oregon standard for addressing interlocutory decisions that have the effect of requiring someone to go through trial when they shouldn't have to is really more liberal in state court than it is in federal court because federal courts do not allow interlocutory appeals when a trial court, a federal district court, has denied a long-arm personal jurisdiction motion. Oregon does, however, by way of writ of mandamus. The fact is that there is no interlocutory appeal of any kind in any situation in the Oregon court system. But that doesn't mean that the Oregon Supreme Court does not and would not review an order like this. It would do so by way of mandamus. As a matter of court, I understood that it was only rarely that this was not done as a matter of course. Oh, well, it's not done as a matter of course in the Oregon Supreme Court, no. But there are many, many cases in which the Oregon Supreme Court has issued writs of mandamus to determine before judgment, before trial, whether or not a motion to dismiss for lack of personal jurisdiction was proper or not. Sometimes it issues the peremptory writ saying, no, you made a mistake. You've got to grant that order, grant the motion, and dismiss the guy. Sometimes they say, no, you're right, you'll let him go to trial. But the point is, he's exercised his right. And sometimes they deny the writ altogether. Pardon me?  Sure. I mean, without reaching the merits. Or do they reach the merits any time a writ is sought? No, they can deny the writ. Sometimes they grant the alternative writ of mandamus and then decide the case on the merits. In many occasions, they grant the alternative writ saying, trial judge, you either vacate your order or show cause why you should not be required to vacate it. And then the case is briefed on the merits, just like this one has been briefed on the merits. And the court decides the jurisdictional question on the merits before trial by way of writ of mandamus. Now, in Will v. Halleck, what the Supreme Court there said in determining whether this court, whether a federal appeal court should grant, should hear an interlocutory appeal, it said, it boils down to a judgment about the value of the interest that would be lost if you did not hear the appeal. And that's what this case turns on then. That's what the appellate jurisdiction in this case turns on. What is the value of the interest that would be lost? And there are several things in the Oregon statute that point to the fact that this is a very high value that the Oregon legislature put on it. For one thing, they say, you must file this motion within 60 days of the filing of the complaint. No discovery may be had. No motion practice must be had. You must file this motion before you file an answer. The whole point of the statutory scheme in Oregon, as in California, is to say, if this is one of those cases that falls within the substantive reach of the anti-SLAPP statute, then procedurally, we're going to insist that you make that motion early, because the whole point of it, as I say in this new memo this morning, is to nip these cases in the bud. Now, this Court's most recent decision with respect to interlocutory appeal is the Copley Press decision that I cite on page 4 of my memorandum, a case in which, again, this Court did not cite Will v. Halleck. But the court ---- Was that another California anti-SLAPP case? No. It's not a SLAPP case at all. At all. It's not a SLAPP case at all. It was a case involving whether the trial court had erred in unsealing some records. And the ---- But that seems different to me. I mean, and as you point out in your memo at page 4, the harm there is that once the information is disclosed, you can never get it back to seal it. So I could understand from, you know, an interlocutory appellate point of view why you can't wait until after the disclosure before you can effectively appeal. But the principle is the same, Your Honor, and the principle at stake in all of these cases is the horse is out of the barn. Well, you're basically trying to squeeze anti-SLAPP interlocutory appeals into a qualified immunity analysis, right? Exactly. You're trying to say this is just as important as protecting government officials in 1983 cases. Yes. And the Oregon legislature has made that value judgment, that these cases should not be tried at all, that they should not go forward. That's the only purpose of the statute. Mr. Hinkle, the legislature did provide, did it not, that the court could order some discovery on the issues underlying the anti-SLAPP motion if it wished, correct? Yes. So why isn't ---- why shouldn't we take that clue as a signal that if it is a meritorious claim, or I guess it would be a defense, to the action that the court can deal with it on subsequent pretrial motion, summary judgment, for example, and then at that stage we could hear the appeal? Well, we don't know yet what that, under what circumstances the Oregon courts would allow discovery. I've been involved in several of these cases now, and in none of those cases has discovery occurred. Have you ever conducted discovery? And in none of them has discovery been requested, with the exception of this case. I mean, there was some discovery in this case, actually. The Supreme Court did say in Will that, as you said, you know, look, we really mean it, and interlocutory appeals are disfavored. It's an extremely narrow category of cases, and there has to be a really important right that is at stake here before we're going to entertain them. I guess the question that you're asking us to decide is when the Oregon legislature passed this statute, did it make that determination? Yes. But then I get back to Judge Corman's question. You know, we're back to Erie v. Tompkins. You know, is that substantive or procedural when a Federal court is trying to decide whether it has interlocutory appellate jurisdiction? I think there's no question that that's procedural. And if it's procedural, then we've got the Supreme Court decision in Will that tells us that we must look with the jaundiced eye to any effort to expand interlocutory jurisdiction. Yes, but you look to the underlying value of the substantive law that is being invoked. And the question has been phrased in several opinions, including a couple of your own, you being the court, you personally, is can this be corrected? Is this an immunity from suit or is it an immunity from liability? The Oregon SLAF statute is not an immunity from liability. It has nothing to do with the substantive law of libel or defamation or any other tort. How can you say it's an immunity from suit? I don't understand. This may be a problem with our earlier decision, but I don't understand how you could say it has nothing to do with the substantive law. I mean, it's integrally related with the merits. In a motion for summary judgment, the defendant would have the plaintiff or the move-in would have the obligation to show there was no tribal issue of fact. In this case, in order to defeat what I would call a motion for summary judgment, the plaintiff would have to show what a reasonable probability of success. That involves an examination of both the law and the merits. It's so integrally related to it, I don't know how you could say it's separate. This Court has already decided that it was separate, Your Honor, in Batzel. That begs the question, though, that Batzel was a pre-will case. The question that we asked you to address was whether or not the subsequent decision in will places in doubt the validity of our analysis in Batzel, particularly with the twist that Judge Corman put on it with his question about the absence from the Oregon statute of an interlocutory appellate provision as we have in the California anti-slap statute. Your Honor, the Second Circuit decided a case called World Trade Center a month or so ago involving interlocutory appeals in that circuit. And the Court went into great detail why the New York State law of appellate review had no relevance. In fact, the New York appellate review was much more liberal. New York State courts allow interlocutory appeals at the drop of a hat, apparently. You're much more familiar. They do. They do. Because the legislature doesn't trust the lower court judges in New York. It doesn't pay them either, from what I read. It doesn't pay them, yes. So the Second Circuit said we examine this New York law, and it's irrelevant because the question of what New York State courts would do in interlocutory appeals of this sort of thing, and it was an immunity question there. Did a state statute, there were two immunity defenses asserted. Was there a state statute immunity, and was there a federal immunity? And the Court actually granted the appeal on the federal immunity, but dismissed it on the state immunity because he said it was not an immunity from suit. It was only an immunity from liability. So I go back to that basic fundamental point here. The Oregon slap statute is not an immunity from liability. It is an immunity from suit for those cases that fall within the four corners of the criteria set out there. I'm concerned about the time. We've got flexibility today because it's the only case, but let me ask a procedural question first. Do you have an arrangement where you're planning to share some time with your colleague? Yes. Okay. But before you leave the podium, let me ask you to address the other question that we posed in advance with regard to the possibility of certification to the Oregon Supreme Court from the perspective of your clients. And on that point, Your Honor, I did submit a more procedurally proper letter. That's on my letterhead. And that's that basic. And that sets out just the last few cases that I could find in which the Court has certified. And it seems to me, in all candor, that the answer is probably yes, you should certify. The only reason I would be reluctant to urge you to do that is just because of the delay. Delay is a factor that you cited in the McClin case, which I cite on page 2 of my letter. Mr. Hagel, can you give us any indication of what your experience has been in Oregon in terms of the amount of time it takes the Oregon Supreme Court to turn these certification questions around? They allow a briefing schedule of, once the questions are formulated, they have a briefing schedule of 28 days, 28 days. And I frankly forgot whether there's a reply brief allowed. Then they set it for oral argument in the ordinary course. And that means another month or so out. And then the Court takes a file. So it could be a year or more before? I would guess that it would be a year as a safe estimate. I do want to allow Ms. Van Dien some time. Well, because we took up so much time on jurisdiction, I'm going to give you some extra time, both sides, if you need it. So go ahead and address the merits, if you wish. Well, on the merits, Your Honor, there are a number of questions that are presented on the merits, some including erroneous evidentiary rulings by the district court. She misapplied the hearsay rule. She misapplied the law of conditional privilege. And she misapplied and she did not apply at all, didn't even look at the question of actual malice under the New York Times v. Sullivan line of cases. So those are all errors of law that this Court reviews freely. And we think the Court can and should reverse on each one of them. The question of whether or not the statute applies, this is the first line of defense raised by my opponent, that this is not a question of matter of public interest. Under the SLAP statute, the speech has to relate to a matter of public interest. Here, the district court made a very odd ruling, that it was a matter of public interest if you're talking to a criminal defense lawyer or the district attorney's office in San Diego County. And that distinction makes no sense whatever in terms of this statute, because whether or not a given communication is a matter of public interest depends on the content of the communication, not on the recipient. So we think the district court misconstrued that in saying that the statute didn't apply. If you agree with me on that point, that the statute does apply, then you reach the substantive law question of did the plaintiff come forward with a prima facie case to show that he has a defamation claim against these defendants. And here, my defendants are in a different position from Ms. Van Meter's defendants, because the communications were totally separate and unrelated. And with respect to my defendants, there are only three communications at stake. The letter to the Ohio prisoner, in which the only allegedly defamatory statement was the matter is still under investigation by the American Academy of Forensic Sciences. They claim that was libelous, because in fact, the board of directors had dismissed the case about a week before Mr. Epstein wrote that letter. Mr. Epstein was not informed of that fact until the week after he wrote that letter. The only claim against Patty Lowe is that she wrote a memorandum in her capacity as a police officer, a police official in the San Diego Police Department, to a member of the district attorney staff in San Diego County making comments about Mr. Englert. I'm just curious. How did that memo get public? That doesn't strike me as something that typically would surface. I'm just curious, as a matter of fact, how that memo ever saw the light of day outside the DA's office. I don't recall that the record reflects that, Your Honor. And I don't know, as I stand here today. Okay. Shall we hear from Ms. Van Vita? Mary, why don't you reset the clock to ten minutes? Thank you, Your Honor. You're welcome. Good morning. May it please the Court, my name is Heather Van Vita. I represent Mr. Herbert McDonald. I'm happy to address any more questions that the Court may have on either certification or jurisdiction, but I'm assuming you may have exhausted I think we have that issue well in mind. Go ahead. Reaching the merits of the appeal. In this case, my client, as Mr. Englert suggested, and this is correct, my client had separate communications. They were unrelated to any of the ethics proceedings at the various professional organizations. My client made juvenile comments about the plaintiff, calling him a whore, something akin to calling the police a pig, or various hyperbole comments like that. In this situation, the district court did not independently analyze any of those statements. The court did not reach that issue whatsoever. As Mr. Hinkle suggested, the court merely reached the very first step of the analysis set out in the Oregon statute, which is determining whether the defendants have made a prima facie showing that their speech or conduct was within the realm of the statute. The court incorrectly imposed several additional requirements on the statutory language. They do not appear in the plain language of the statute. One of the requirements that the district court imposed was a forum requirement, indicating that a party could only make and exercise their free speech rights if it were in either inside a courtroom or at an ethics proceeding. That may be covered by subsection C of the statute, of ORS 31-150, sub 2, sub C, where there is a reference to a public forum. However, we did not rely on subsection C in any part of our briefing. We relied on subsection D. Subsection D is very explicit and says any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest. There is no forum requirement in subsection D, and quite frankly, it wouldn't make sense, for instance, to protect communications inside the courtroom, but not protect communications in preparation for getting to the courtroom. That would be an absurd result. What do you understand the purpose of the anti-SLAPP statute to be? The stated purpose of the anti-SLAPP statute is to protect persons who are exercising their free speech rights from lawsuits that are based on their exercise of their free speech rights on an issue of public interest, as is described in subsection D. So the limitation that's applicable here is really the public interest limitation. There is nothing in the purpose section of the statute, or what I understand to be the purpose of the statute, that ties uniquely to forum. It's the public interest part that the district court was looking at and that we have to look at. Why is it you think that the statements made by your client fall within the public interest category? And this is an important distinction because the district court improperly read subsection D to require the statements to be in furtherance of a public interest. That is not what the statute requires. The statute protects any other conduct that is exercising the right of free speech in connection with a public issue or an issue of public interest. My client, Mr. McDonnell, was commenting in various fora regarding the plaintiff, Mr. Engler's qualifications as an expert witness in criminal murder, death penalty, and similar trials. That is absolutely an issue of public interest. The fact that my client used hyperbole or colorful language in describing the plaintiff does not mean that his speech is any less protected than, for instance, the codefendant's speech in the ethics complaints and related discussions. The selection of the words used is not a matter of inquiry on this statute. In some ways, the more colorful the language, the more difficult it is to apply a legal standard to it. If you call somebody a jerk, the sentiment is clear, but the substance is a little elusive. But if you call somebody a liar, and I think it's the part of your client's statements that get to things like liar or liar for hire or falsehoods on his CV, it may be that the more colorful terms can't really be evaluated in this context. But the liar-type term could. Now, that could be of public interest, no question. If you have an expert witness who routinely lies and fabricates evidence, that at some level should be of public interest. But why is you've offered an argument saying that some of the hyperbole, I think the term is used, is not subject to something the court can examine. But at least some of your client's comments were more than just hyperbole. They were pretty specific in accusing of falsehoods. Precisely the issue, though, Your Honor, all of my client's statements related to Mr. Englert's qualifications as an expert witness or liar for hire. Well, he accused him of sexual misconduct. That's a stretch to suggest that that relates to his qualifications as a budget expert. This gets to an additional point, Your Honor, in that the complaint allegations have absolutely no allegation of some vague, you know, suggestion that the plaintiff was a sexual deviant. That is not part of the complaint allegations. Well, let's assume for purposes of my hypothetical question that it was implicated in this case. Would that make a difference? In this instance, Your Honor, no, because the statute sets out the two-part test or two-part analysis for determining whether the anti-slap motion should be granted. The first step is on the face of the allegations in the complaint, are those allegations, are the statements that my client made, liar for hire, whore, you know, CV contains falsehoods, things like that, are those statements an exercise of free speech on an issue of public interest? That's a prima facie question, and those are. You are urging us to find it's a matter of public interest because these bloodstain experts routinely testify in public trials, some of them very high-profile trials like the Robert Blake murder case. Robert Blake, the fact that. Okay. Let's suppose that none of these cases were high-profile cases. They were just sort of run-of-the-mill cases that only the lawyers, the judges, and the parties are interested in. Would that make a difference in our analysis as to whether or not this was an issue of public interest? Your Honor, I don't think the level of profile of the case should at all come into play. I think that the issue that is the public interest issue is whether expert testimony is being submitted in the criminal justice system on death penalty cases, murder cases, attempted murder cases. Well, now you're starting to sound like high profile makes a difference. Well. Let's forget about, I mean, I realize these are bloodstains, so we can't really exclude murder cases, but your argument has to be that any time a witness appears as a witness in a public courtroom, that that immediately elevates that witness's status and anything that's said about that witness to be a matter of public concern. Your Honor, I'm not saying that. And fortunately for me, that is not a question that this Court even has to reach because the fact is that this, the experts at issue, particularly Mr. Englert, the issue is whether he is properly testifying on bloodstain pattern evidence, which really by definition would only be coming into play in murder trials, death penalty cases, attempted murder trials, things where there's blood involved. I don't know the answer to the question, you know, if it's a, you know, a theft three. You know, frankly, I don't know if that would still rank as an issue of public interest, but that is not the situation we have here. The problem is I read our cases where we wrestle with whether or not the statements at issue are a public concern, and I'm hard pressed to find any guideposts by which I can make that determination. Well, I think the District Court made that determination already, Your Honor. The District Court did agree that this was an issue of public interest. The District Court then imposed additional requirements on the statute that do not exist in the statute. So in that regard, you know, again, to the extent that we're looking at other cases as guidance, comments about a jet ski dealer and his treatment of customers was an issue of public interest. Cat breeding was an issue of public interest. Appaloosa horses. Appaloosa horses and horse racing trainers was an issue of public interest. I'm unaware of any issue that could be of greater public interest, as seen in the recent death penalty case law that was up at the U.S. Supreme Court. I'm unaware of any public interest more important than the effective administration of the criminal justice system and whether we're improperly convicting defendants, say, maybe presidential elections. It sounds like what you're asking us to do is essentially extend the privilege that attaches to statements that a witness may make on the witness stand from civil liability to these people because they are experts and therefore anything that is said about their qualification as an expert, whether it's said in the form of a question on impeachment at the trial or in a courthouse step interview with a talking head television reporter commenting on the trial, is all protected. Your Honor, I'm not asking for any particular extension of a common law, you know, immunity situation, although there certainly are those immunities in the restatements and recognized in Oregon law. What I'm asking for is application of the statute. But the position has to be that that's all a matter of public interest, whether the comment is made on the steps of the courthouse in an interview or from the witness stand in response to questions. Correct, Your Honor, and that's what the statute says. We're asking for application of the statute based on the plain language of the statute. Okay. Let's hear from the other side. Thank you. Thank you very much. Thank you, Your Honors. May it please the Court. My name is Bob Udzila, and Mr. Calzareta and I represent the beleaguered plaintiff in this case. Just to respond to Ms. Van Eeden's talk about public interest and public concern, I think that Your Honor has it right. If we turn, if we broaden the scope of what public interest is and we broaden the scope of what public concern is, what we've done is we have insulated from defamation lawsuits anybody who goes on the witness stand in any kind of a case, because you can call that person a perjurer, according to what I'm hearing, and that's perfectly okay because testimony under oath is in the matter of public interest. Well, the United States Supreme Court in Milkovich said calling somebody a perjurer is defamatory. So I don't think that we can explain. Well, those aren't inconsistent. You can defame somebody about something that's of public interest. I'm sorry, Your Honor. I did not understand. Well, you said the Supreme Court called it defamatory. Yes. Yes. But I think that's a non sequitur. That doesn't say whether it's of public interest or not. I can defame the President in colorful language and people do every day. That doesn't mean it's not of public interest and not protected. I understand your point, Your Honor. But still, look at this. If we're going to extend it to any, how about expert witnesses? Does that mean that if we have doctors who testify regularly for plaintiffs or defendants that their testimony is a matter of public concern? Well, I think on some level, if you've got somebody, let's take the particular case here. You've got somebody who testifies as a career a large number of times, criminal cases on behalf of the prosecution. Shouldn't the public be interested if the prosecutor is routinely submitting evidence from somebody who fabricates evidence? Well, I suppose that's absolutely correct, Your Honor. But as the district court said, with respect to this kind of testimony, understand that this is the thing that cross-examination takes care of in the public forum. In the public forum, but doesn't the public have an interest? If my local prosecutor is routinely submitting as an expert witness somebody who fabricates evidence, don't I have a concern about the performance of the prosecutor even if I'm not a criminal defendant eager to cross-examine? I take the point, Your Honor. Yes, you do. The question, though, is whether that's the kind of public interest that the Oregon legislature was talking about when it passed the amnesty act. Well, let's talk about Kathy Lowe. Pardon me? Kathy Lowe. Let's talk about the criminalist from the San Diego Police Department. She was not a – she was not a – Who was it? Patty. Patty Lowe. It's my understanding she was not a police officer, Your Honor. She was working in the lab. Well, she's a criminalist, okay? She's a lab person on the staff of the police department. She sends an internal memo to the district attorney's office saying, look, in order to protect the integrity of our criminal investigations and prosecutions, I don't think you should be calling your client as an expert witness in any future cases because there's – he's just carrying too much baggage and he's too susceptible based on things he's done and said to cross-examination because of all these allegations that you're making, and I don't think we should use them anymore because I want to win our cases. Isn't that a matter of great public interest? It could be, but there's also the question of abuse of that privilege, and this lady also confronted a prosecutor in court. This lady also sat in court while the plaintiff was testifying  This particular defendant – But how is that different from any other expert for the other side who sits in the courtroom, listens to the opposing expert, and provides feedback to the lawyer for her side as to how she might then impeach the expert? I'm having a hard time finding why that isn't in the public interest. It probably is, Your Honor, and I will concede that. But, again, we're talking about the abuse of that. Remember, all they're talking about is a common interest. Well, what if the statute says that it's of public interest so the statute applies, but you can abuse that so the statute doesn't apply anymore? The question we're addressing now is whether the anti-SLAPP statute applies. I'm not saying whether the claim is meritorious because even if the anti-SLAPP statute applies, you've got a basis for saying, but the claim is meritorious. Right now, we're still on whether the statute applies. Right. I guess the best I can do, Your Honor, is they want to use the California law to define what it is that you should be doing with this Oregon statute. And the case that I have is called Terry v. Davis Community, which I believe that one of the defendants cited. And here's what they say about public interest in their statute. It's not mere curiosity. A substantial number of people must have a concern. The matter of concern to the speaker in a relatively small, specific audience is not a matter of public interest. So if the Court believes that, for example, there are allegations that a prosecutor is using an expert who is routinely, routinely lying under oath, then I suppose it does fit even in that definition. But again, I would go back to the legislative history that we submitted to the Court in our excerpt. Never, ever was this talked about. The public interest they were talking about was they were talking about people who were concerned about what was going on in their community when they were going to testify before legislative bridges, when they were writing letters to the editor with respect to whether or not a new development should come in, whether Walmart should come in. Those are the kinds of people that they were trying to protect. Well, the popular image of this statute is what you described there. The big developer who's got resources, who doesn't care about the merit of the suit, it's in the phrase strategic litigation against public participation. Let's crush the little guy so he can't open his mouth. Right. So we move a little bit away from public interest. Is there something in the statute that captures that image or makes it a requirement that, in fact, for the statute to apply? Excuse me. You have to have a big guy versus little guy, which you really don't have here. Although I understand that to be the theory of the statute, I don't see anything in the statute that really says it's only going to apply in that context. No, I don't either, Your Honor. And you would need to look at the legislative history. And, of course, our Oregon Supreme Court does that routinely now. We have a statute on which that permits that. You just said Oregon Supreme Court. Let me pose to you the question that we've posed in advance. Is this the kind of thing that should be certified to the Oregon court? I agree with Mr. Hinkle. It absolutely is. The case of Western Helicopters, the Oregon Supreme Court case, that sets forth the criteria that not only the statute requires but also the discretion that the Supreme Court is going to use if it accepts certification from this court or from any other court. The statute is, would it come from a designated court? It would. Is it a question of law? Yes. Is it a question of Oregon law? Yes. Is it possible to determine the cause? And the answer is yes, because if the anti-SLAPP statute doesn't apply to this case, the appeal goes away. There's no public jurisdiction here. Is there any controlling precedent from either the Court of Appeals of the State of Oregon or the Oregon Supreme Court? And the answer to that is no. The Horton case, which the defendant, Mr. Hinkle, cited. I'm also from a smaller town, so I understand. Specifically said that they are not resolving the scope of ORS 3150. It says plaintiff's first assignment of error presents an interesting question concerning the scope, but we need not resolve that because they decided it on another ground. So there is no appellate decision. Counsel, the only thing that gives me pause about the certification suggestion is Judge Corman's question, and that is, is this substantive or procedural? Are we really asking the Oregon Supreme Court to make a determination on the interlocutor appeal question that is a procedural question that a Federal court has to ask for itself? Well, you could. I think you could, because I don't think that's dispositive of whether you need to certify that. Yeah. I mean, we've got some other issues related to the statute. There are plenty of other issues as to why it is that you should certify this statute is because, from my reading of the statute, it's very, very difficult to understand what it is that the Oregon legislature was talking about. Just in terms of appealability, for example, A, they do not adopt the appealability provision from the California Code. So if you're going to say, well, if you adopt the statute wholesale, we look at your cases, we can't do that here because you don't have that. The second thing is, is that they say that the judgment that's going to be entered here is if you have your motion granted is without prejudice. Without prejudice is not an appealable issue in Oregon. If there's a judgment without prejudice, you can't appeal it. I disagree slightly with Mr. Hinkle in terms of whether there is any provision in Oregon law for an interlocutory appeal, and there is in what in our rules of civil procedure 67 sub B. And that provides for a limited judgment when you have more than one claim or more than one defendant and you get a dispositive order on one of those, you can ask the immediately appealable. So it would be akin to our federal rule of civil procedure 54 B? It would be. Okay. It would be. So that's the only time that I know of interlocutory appeal. What about these mandamus cases? Well, mandamus cases, of course, but, Your Honor, that's discretionary, and they don't always grant mandamus. And so it's only in review. Your colleague was suggesting that they don't grant it if they find without merit. I always understood, certainly in the federal system, that even without regard to the merits, a court, it's sort of like certiorari jurisdiction in the Supreme Court. You could have an entirely meritorious ground for seeking cert, and the court could deny it. Is that what we're talking about, a mandamus, that it's not? It's my understanding of mandamus. The ones that I have handled, Your Honor, they're almost boilerplate. That is, extraordinary writ, it's discretionary, and you don't have to do it. I mean, so that's my understanding of mandamus law in Oregon. And I don't know of any Mr. Hinkle may correct me. I don't know of any case that says if this is a personal jurisdiction matter, you absolutely get mandamus. I don't think that's Oregon law. Okay? So should the court certify? I suspect that the court should certify. And many questions could be asked in terms of what this statute means and what's the scope of subsection D, number one. What is an issue of public interest for purposes of that statute? But more importantly, from my perspective as the plaintiff, Your Honor, is I'm looking at what is the plaintiff's burden in this case? Because I've read this part in paragraph 3 that says that the plaintiff has got to prove that he will prevail on the claim by presenting, quote, substantial evidence to support a prima facie case, unquote. I've read that statement to a lot of lawyers, and they say, what? What is substantial evidence of a prima facie case? Judge Aiken found that the plaintiff presented a prima facie case in this case. Why don't we win? And so that would be one of the real issues that I would ask that the court, ask the Oregon Supreme Court to say, what did the legislature do when they put that language in the statute? In terms of the merits of the claims, we think that Judge Aiken did a – she had a record before her that she analyzed correctly. She saw what was happening. These people had an intent to disseminate. There is no question at all that these people had an intent to disseminate. And it's demonstrated, actually, by one of the exhibits. It's Exhibit 10, Plaintiff's Submission. And unfortunately, I don't believe that it got into the excerpt. But it is a letter from an attorney in New York to Mr. Epstein, one of Mr. Epstein's attorneys, on June 27th of 2003. And he's asking about the ethics complaints that are going to be filed to the AAFS, which were filed approximately a week before that. So the idea that they're going to this forum and they're going to do good for everyone before this forum to make sure that Mr. Englert is doing right by his CV and his testimony is absolutely disproved by that. They're already out in the community. They're already out disseminating these materials in the community before Mr. Englert is even notified in September that these charges have been made. And eight months before, he gets an opportunity to defend himself in February  Those materials are already out in the community. So Judge Aiken had before her plenty of evidence to demonstrate that this group was disseminating. And, you know, the findings of Judge Aiken are to be given deference. And as I understand, a recent U.S. Supreme Court case has told the circuit courts that particularly with respect to evidentiary issues, that you're supposed to defer very heavily to the trial judge. She read this record and she understood what was going on and she said, this person, this person, and this person were disseminating these materials. Mr. McDonald has been doing it for 13 years. You know, counsel, one of the things that concerns me, and maybe this is a concern that only a legislator should have, a concern only a legislator should have when he or she is considering whether to vote for an anti-SLAPP statute. But it strikes me that on one level, it's not improper for expert witnesses who routinely testify for one side or the other to be providing attorneys who are interested in finding out about the other side's expert to learn what potential impeachment material may be out there. And I'm not surprised that the word spread like wildfire once ethics complaints were filed, whether they were meritorious or not, that lawyers who were going to be facing your client wanted to get their hands on whatever it was that was being said about him for potential use when they faced him on deposition or on the witness stand. That's precisely right. It's not at all a surprise, and that's why it's so bad. Because, well, first of all, the ethics complaints were supposed to be confidential and they were supposed to only go to the AAFS, period. Their own rules said that. So Mr. Epstein immediately broke the rules when he was talking with a lawyer in New York about the ethics complaints. That's number one. Number two, they're supposed to be confidential after it was decided, and it's still going all over the place. And these are the folks who submitted the ethics complaints to the AAFS, to the IABPA, to the Swigstein. You know, we cited a case in Oregon, the Kramer case, where it was an allegation of child molestation by a teacher. And so they went to one forum and they lost. They took the same evidence and went to another forum and they lost. They took that same evidence to the school board and they lost. And the Oregon Court of Appeals said, you know, you can't do that. You can't do that once you know that that's exactly what these did. But these, you know, I guess I'm – let's look at it from the other side. Suppose all this information is true. And then it becomes highly relevant from a cross-examination standpoint to be able to use this kind of information to discredit the opinions that the expert is – No question about it, Your Honor, if it's true.  Here's a conviction. You've been convicted of perjury, haven't you, Mr. Englert? Yeah, great. You can do that. But unless and until it's proved to be true, that's not the case. But, you know, particularly with experts, and maybe it's just the nature of this case, where under Daubert, the trial court's going to have to make a determination as to whether or not there is a foundation for the expert's opinion that is generally accepted by peers in the community and that this is not just junk science that he's advocating. This doesn't seem to me to be the kind of thing that the SLAP statute was designed to address. Well, that's our point, Your Honor, and that would be another reason why, you know, if you were so inclined to certify to the court, to find out why. California passed, after they passed their original SLAP statute, they passed an anti-anti-SLAP statute that says that if it is people who are competing in the business world and that all it is is these guys are lying about each other, that's not protected. And so it would be one of the questions that I would want to ask the Supreme Court. Unless the court has other questions, I think I've pretty much run out of steam. Anything else? I think not. Thank you very much. Thank you very much, Your Honor. Mr. Hinkle will give you a minute or two on rebuttal. Thank you, Your Honor. One of the problems we had below and again here is what are the statements, what are the defamatory communications that are the basis of the plaintiff's claims? They didn't allege them in the complaint. We thought now, after the trial court winnowed the wheat from the chaff, that we are talking about three communications, one by Epstein, one by Lowe, and one by James. Now Mr. Idzilla stands up here and tells you they were, this group was disseminating material all over the place. And he talks about a letter from a New York lawyer, not anything we sent to him, but from a New York lawyer. He talks about what Patty Lowe was doing in the courtroom. Those are not part of their libel case. They even admit in their red brief that they have no claim against two of the defendants that they named in the complaint, DeForest and Labor. They said, oh, well, no, we don't have any claim against them. Well, why did they name them as defendants? I mean, you comb through this record and you decide what are the state, what are the allegedly defamatory statements, other than the statements that were made to the professional organizations, which are apparently out of the case. We won on that. They didn't cross appeal and they make no claim about that this morning. So we're talking about those three statements alone. Now, what did Oregon legislature mean by a matter of public interest when they adopted this statute? They were expressly discussing the California statute. They were told by legislative council that this was modeled on the California statute. In fact, the four subsections of the rule that were a statute that we're relying on are verbatim copies of the California statute. I take it Oregon, however, has not followed California's lead in adopting an anti-anti-SLAP statute. That's correct, Your Honor. There's no such amendment. And by the time Oregon had adopted this statute, it was California courts had held that a private memorandum circulated among court reporters was a matter of public interest. I'm quoting now from page 23 of the blue brief. And in another case, private communications between a homeowner and her employer regarding a plan to place a homeless shelter in her neighborhood, private communications between an employee and her employer, those are matters of public interest under the California statute. These cases were decided before Oregon adopted the statute. And when Oregon adopts verbatim a California statute, the Oregon courts have said, well, we assume that they brought along that bag and baggage, that judicial interpretation and application of it. On the question of certification, again going back to what Judge Corman said, I've just been pondering here whether or not you should certify a question about the appealability issue, too. If there's any hint that the state procedural rule about reviewability would have any effect on federal appealability. It wasn't. That really wasn't. What concerned me is that if the interest of Oregon, how important an interest is it to prevent these people from being forced to trial. And California, the fact that California provided for an interlocutory appeal and the legislative history that's quoted in our own opinion, suggested that California thought that this was such a significant interest that they were going to provide explicitly for a right to an appeal, even though in California you could get an appeal by an extraordinary writ. So my own view is that it's really a question of if they enacted the California statute, they deliberately excluded a right to an appeal as a matter of right. Doesn't that suggest that the Oregon interest is not as great in protecting the defendant from going to trial where the plaintiff has been unable to meet, otherwise arguably been unable to meet its burden? I wouldn't see any point in adopting the statute in the first place, Your Honor, if that was not their intent, when they're adopting verbatim a California statute. But they didn't adopt it verbatim. You see, that's the point. But the substance of it, the substance. I know, but the absence of this procedural remedy tells you something about how significant they thought this right was. I mean, after all, they've given you a right and a judge is going to decide it and the only question is whether is it important enough, in effect, this right is so important that we don't want to leave it to just the lower court judge. It's so important. We want it to be appealed. And it seems to me that the fact that Oregon hasn't provided for a right to an appeal suggests that they don't regard this interest as that significant. Well, but, Your Honor, there's no right to appeal even in an immunity case in state court. You know, suppose I sued you in state court and you asserted some immunity and the court denied it. There's no way you could appeal it either. And so that doesn't tell us anything one way or another about the importance of the interest. You would have to go up by way of mandamus because there is no interlocutory appeal at all. Mr. Udzila talks about one exception, but that's when the lower court has, in fact, entered a judgment, a limited judgment, a partial judgment. The question is doesn't this provide a – I was bound by the earlier decision of our own court with respect to the California statute. My own view is that that, with all due respect, was not rightly decided. But doesn't the fact that they have – that this statute is different in a way that's significant from the California statute provide a basis for distinguishing this case from our earlier decision? I do not believe so, Your Honor, because of the difference in the appellate procedures in the two states. Oregon allows no interlocutory appeals no matter how strong the interest is. And if I sued the President of the United States in state court and he lost a motion to dismiss on grounds of immunity, he could not appeal that either. Now, what stronger interest is there than that? You would allow it in federal court. By definition, you would allow it in federal court, but it would not be allowed in state court. But appellate review is available in state court at the discretion of the Oregon Supreme Court by way of mandamus. And that's how you would attack it if you were sued personally, individually, as a federal judge in an Oregon state court and you lost your motion to dismiss on grounds of immunity or whatever, you would – and if by some quirk the trial judge denied that motion, you would take it up by writ of mandamus. That is discretionary, yes, but the review is available. That was true in California. According to the discussion from the legislative history that we set up, in our opinion, they mention that the review is available by extraordinary – you know, by a discretionary writ. Just one last comment, Your Honor. Again, I don't think that the statute can be read in any other way other than to say that it is an immunity from suit, not an immunity from liability. And consider what would happen if the motion is denied. I mean, one of the points of – one of the debates about the interlocutory appeal business is, is it reviewable after final judgment? Well, suppose we bring it up after, you know, this motion is denied. Then we go through a year of discovery. We have $100,000 to $200,000 worth of attorney's fees. You go through trial. Then on appeal, the Ninth Circuit tells us, oh, the anti-SLAPP statute should have been granted. Does that mean we get attorney's fees for the entire case then? Because an award of attorney's fees in an anti-SLAPP statute is mandatory in Oregon. Mr. Hinkle, what's your response to the point about the fact that if the Court does grant the motion to strike, it enters a judgment of dismissal without prejudice? Oh, well, Mr. Edzula, it's just wrong about that not being appealable. It is – it is appealable. But, I mean, that – to say it's without prejudice, that's like a red flag in a federal court, that you don't have a final judgment. It's almost conclusive on the – on the appealability of a ruling. Well, not in Oregon State Court. It is a final judgment. It is appealable. The only thing that without prejudice means in Oregon State Court is that you have the right to refile a new complaint. Right. Within a year. And it's without prejudice to your asserting any other claims. You might even have an amended complaint. In fact, I think this Court has held in one of the California anti-SLAPP appeals that you – that you must allow the plaintiff the right to amend. Which, in fact, they did here. They did amend. Okay. Well, I want to thank both counsel. The case was very well argued, and we appreciate your help on it. We're trying to figure out what to do on the certification question. The case is submitted for decision and will be adjourned until tomorrow.
judges: Tallman, Clifton, Korman